607 A.2d 710

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Robert WHARTON, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 7, 1987.

Re-argued Jan. 18, 1989 and April 8, 1991.

Decided April 28, 1992.

130

132

William T. Cannon, Philadelphia, for appellant.

Ronald Eisenberg, Chief, Appeals Div., Gaele McLaughlin Barthold, Deputy Dist. Atty., Helen Kane, Asst. Dist. Atty., Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

ZAPPALA, Justice.

The victims in this case, Bradley and Ferne Hart, husband and wife, were subjected to a reign of terror by Robert Wharton, the appellant, and others, commencing in the summer of 1983, and ending tragically in their deaths on January 30, 1984. Appellant was arrested on February 7, 1984, and charged with two counts of homicide, robbery, criminal conspiracy, and numerous theft, burglary and related offenses. A jury of the Court of Common Pleas of Philadelphia County found him guilty of two counts of murder in the first degree and of all the related offenses. Following a separate sentencing proceeding conducted pursuant to the procedures for capital offenses in the Sentencing Code, 42 Pa.C.S. § 9711, the jury sentenced appellant to death on both counts of murder. Post-verdict motions were denied, and appellant was formally sentenced to death on the two counts of first degree murder. On the conviction for criminal conspiracy, appellant was sentenced to not less than five nor more than ten years imprisonment; and on the

robbery and burglary convictions, terms of imprisonment of not less than ten years nor more than twenty years. All sentences were to run consecutively. This direct appeal automatically follows. 42 Pa.C.S. §§ 9711(h) and 722(4); Pa.R.A.P. Rules 702(b) and 1941.

The evidence of record, viewed in the light most favorable to the verdict winner, the Commonwealth, *Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531 (1986), discloses the following. During the summer of 1983, appellant had been employed by Norman Owens, a general contractor, and had performed certain repair and construction work at the home of the Harts and also at a radio station owned by the Reverend Dr. Samuel B. Hart which was then managed by his son, Bradley. Bradley Hart had complained to Norman Owens about the quality of work done by appellant and his co-worker, Larue Owens (Norman Owens's son), and had refused to pay the elder Owens the full amount agreed to for that work. Norman Owens explained to appellant that he had not been paid in full because of Bradley Hart's dissatisfaction with appellant's work, and that when he (Mr. Owens) got paid, appellant would get paid. In retribution for not receiving payment that he thought he deserved, appellant began harassing the Hart family.

On August 14, 1983, the Hart residence in the Mount Airy section of Philadelphia was burglarized by appellant and Larue Owens while the Hart family were at Sunday religious services. Numerous items were stolen from the residence.

The following week, on August 22, 1983, the Hart residence was again burglarized and, in addition, was extensively vandalized. Appellant, accompanied by Larue Owens and Eric Mason, slashed and overturned furniture; ransacked closets; threw bleach, paint, baby oil, eggs, syrup and other items around the house; and drove a knife into a sofa cushion. Human excrement was also left in the house, the heat had been set at 90 degrees, and the stench of urine filled the air. Additionally, the faces of Bradley, Ferne and

Lisa Hart (their daughter) had been completely blotted-out by yellow paint on family photographs.

An insurance adjuster investigating these two incidents compiled a list of the stolen items and itemized the damages to the household. The list of stolen items included televisions, stereo equipment, cameras and accessories, telephones, and numerous other appliances and electronic items. The vandalism caused damage in excess of $3,000.

On September 4, 1983, the Germantown Christian Academy Church was burglarized by appellant and Eric Mason. Dr. Samuel Hart was the founder of this church, and Bradley Hart was a deacon. A computer and petty cash were stolen from the church, and a photograph of Bradley Hart was pinned to a wall by a letter opener.

The following morning, at about 4:00 a.m., Philadelphia Police Officer Joseph Mullin was patrolling in the vicinity of the church when he observed Eric Mason carrying what he at first believed to be a television set. Upon closer inspection, Officer Mullin discovered that Mr. Mason was carrying a personal computer. He explained to Officer Mullin that he had been out jogging and found the computer in the trash. At that time, Mason was wearing a black karate outfit and sandals and showed no signs of physical exertion. Mason's appearance led the officer to find the explanation implausible. Mason was taken to the police station where the computer was impounded, a receipt was issued, and Mason was released. On September 14, 1983, Mason was charged with burglary of the church.

In January, 1984, Eric Mason, Thomas Nixon and appellant went to the Hart residence, armed and intending to rob them. Nixon gained entry to their home on the pretext that his car had broken down and he needed to use their telephone. Appellant and Mason waited outside. Once inside, Nixon decided not to go through with the plan because there was another person in the house.

On January 30, 1984, appellant and Eric Mason went to the Hart residence, and appellant gained entry at knife

point. Appellant forced Hart to write him a check, and then he and Mason tied Bradley and Ferne Hart up and made them sit on the couch while the two intruders watched television and talked. The two men decided to separate the Harts, taking Bradley Hart to the basement and Ferne Hart to the second floor, where they taped their faces (eyes, nose and mouth) with adhesive duct tape. When Ferne Hart was taken to the second floor, appellant also took the Harts' seven month old daughter, Lisa, to the second floor and put her on a bed.

Appellant then took Ferne Hart into the bathroom and tied her hands and feet with neckties. He strangled her with a necktie, filled the tub with water and held her head under water "until the bubbles stopped after a while." Her body was left draped over the bathtub, her sweat pants pulled down around her legs and her shirt pulled up, exposing her breasts. (There was no forensic evidence, however, of sexual molestation.)

Bradley Hart was forced to lie face down in a pan of water while one of the intruders stood with one foot on his back, as shown by a footprint on this victim's shirt, pulling on an electrical cord tied around his neck.

Additional items, including Mr. Hart's coat and a camera and camera bag, were then stolen by appellant and Mason. The two then turned off the heat, extinguished the back light, locked the door and left the premises, abandoning the victims' infant daughter.

On February 2, 1984, concerned that he had not heard from his son or daughter-in-law, Dr. Hart went to his son's residence. After forcing open the door, he heard the cries of his granddaughter, Lisa, and found her on the second floor. The house temperature had dropped to approximately fifty degrees. Dr. Hart also discovered the bodies of his son and daughter-in-law.

Lisa Hart was taken to a local hospital in a "preshock" state, suffering from dehydration and hypothermia. She

also suffered respiratory arrest on the way to the hospital. Fortunately, the child survived.

After interviewing various witnesses concerning the incident, police suspected that appellant was involved in the Hart robbery. Acting upon a statement from the mother of appellant's girlfriend, who had told police that appellant gave her daughter a camera, the police executed a search warrant for the residence of appellant's girlfriend or fiancee, and discovered several of the items that had been stolen from the Harts, including a camera and case, video games and a television. On February 7, 1984, the appellant was arrested for the homicides. A search of his residence at the time of the arrest, pursuant to a warrant, disclosed other stolen items from the Harts' residence and the knife used by the appellant to gain entry therein. After being advised of his constitutional rights, and executing written waivers of those rights, appellant confessed to the robbery of the Hart residence on January 30, 1984 and to killing Ferne Hart. He named Eric Mason as his accomplice, stating that he left Mason downstairs with Bradley Hart. Appellant did not state that Eric Mason actually killed Mr. Hart.

Appellant also gave separate statements admitting his participation in the two earlier burglaries of the Hart residence, and the burglary of the Germantown Christian Academy.

Also on February 7, 1984, Eric Mason was arrested and his residence searched pursuant to a warrant, revealing numerous items stolen from the Harts, including Mr. Hart's topcoat. Additionally, several pairs of Mason's sneakers were seized, one of which matched the imprint found on Bradley Hart's shirt. After waiving his *Miranda* rights in writing, Eric Mason confessed to participating in the burglary and homicides on January 30, 1984, but he stated that he could not go through with actually killing Bradley Hart leaving him for appellant to kill.

After having denied the defendant's pretrial motion to sever, the appellant and Eric Mason were tried jointly for

the homicides, robbery, criminal conspiracy, and for all of the burglaries of the Hart residence and church, and related offenses. (Eric Mason was not charged in the August 14, 1983 burglary.) A jury trial commenced on June 13, 1985. At the time of trial, the Commonwealth presented its case through the use of exhibits, testimony of various witnesses, including the forensic medical examiner and the codefendants' confessions [1].

The jury returned verdicts on July 2, 1985, finding appellant and Mason guilty of two counts of murder of the first degree and guilty of all charges of criminal conspiracy, robbery, burglary and related offenses. Two days of hearings followed to determine the appropriate penalty. The Commonwealth presented no additional evidence, but rested its case on the evidence that had been presented at the guilt phase of the proceedings. The Commonwealth argued that four aggravating circumstances were presented for each defendant, "the defendant committed a killing while in the perpetration of a felony;" "in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense;" "the offense was committed by means of torture;" and "the defendant has been convicted of another ... State offense, committed ... at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable...." 42 Pa.C.S. § 9711(d)(6–8) and (10). The jury found the first three of these aggravating circumstances, but did not find that the defendant had been convicted of another state offense. 42 Pa.C.S. § 9711(d)(10).

Appellant presented character witnesses on his behalf who testified that, prior to the incidents portrayed herein, he had been a gentleman of good character who showed leadership qualities. Codefendant Mason also presented character witnesses. The jury found that three mitigating circumstances applied to appellant, namely: "the defendant had no significant history of prior criminal convictions;"

---

1. The confessions of the codefendants had been "redacted" to eliminate references by name to the other.

"the age of the defendant at the time of the crime (appellant was twenty years of age at that time);" and "other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(1), (4) and (8). The jury also found mitigating circumstances existing for codefendant Mason.

On July 5, 1985, the jury returned a sentence of death against appellant on each count of murder of the first degree, based on its determination that the aggravating circumstances it found outweighed the mitigating. 42 Pa. C.S. § 9711(c)(1)(iv). Mason, however, received two sentences of life imprisonment, finding that on each murder conviction, the aggravating circumstances did not outweigh the mitigating. *Id.*

Post-verdict motions were filed and denied. The appellant was formally sentenced on the murder and other convictions on September 24, 1986. This appeal followed.[2]

■ Initially, although appellant does not challenge the sufficiency of the evidence, we must review the record to determine if the evidence was legally sufficient to sustain each of his convictions for murder of the first degree.[3] Clearly, it does. 18 Pa.C.S. § 2502(a). Next, we are called upon to review appellant's assertions of pretrial, trial and sentencing proceeding errors.

**2.** The instant appeal involves appellant's convictions for murder of the first degree, and for robbery and criminal conspiracy arising from the offenses occurring on January 30, 1984. Appeal was lodged in Superior Court from the judgments of sentence imposed on the various convictions arising from the three prior burglaries (of the Hart residence and the church) and related offenses. Appellant petitioned this Court to consolidate these appeals, which we denied on January 13, 1987. Appellant has now filed a petition for reconsideration of that denial, raising no new facts, issues or arguments in support of his motion to consolidate. Accordingly, we deny the petition for reconsideration. *See* Pa.R.A.P. Rules 702(b) and 1941 (with comments).

**3.** In all appeals from a judgment of sentence of death, this Court reviews the record to determine whether the evidence is sufficient beyond a reasonable doubt to sustain the conviction for murder of the first degree. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

Several of appellant's assertions of prejudicial error involve the admission of codefendant Eric Mason's confession in the joint trial. As noted, each defendant confessed to participating in the robbery, conspiracy and murders of Ferne and Bradley Hart on January 30, 1984, and each implicated the other as his accomplice. The confessions were substantially "interlocking," that is, each defendant's account of the events of January 30, 1984, substantially corroborated the account of the other. A significant point of departure in the respective accounts is, however, that appellant confessed to actually killing Ferne Hart, but not Bradley Hart. Appellant stated only that Eric Mason was left in the basement with Bradley Hart, but Eric Mason, on the other hand, stated that when he went to the basement he could not go through with the killing of Bradley Hart because he was scared, thereby inculpating appellant as Mr. Hart's actual killer.

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause of the Sixth Amendment when his non-testifying codefendant's confession *naming him* as a participant in the crime is introduced at their joint trial. The Court held that while a jury is ordinarily presumed to be capable of following a court's instruction regarding a limited use of evidence, the possibility of prejudice arising from the introduction of such a confession by a non-testifying codefendant is so great that a new trial is required even where the court specifically instructs the jury that the codefendant's confession must be considered as evidence only against that codefendant.

Since *Bruton*, it has become "well-settled that redaction can be an appropriate method of protecting defendants' rights under the *Bruton* decision." *Commonwealth v.*

*Johnson,* 474 Pa. 410, 412, 378 A.2d 859 (1977).[4] In *Johnson,* this Court approved the method of redaction of one defendant's confession so that it could be used against a codefendant in a joint trial, stating:

> The basic theory of redaction seems sound. If a confession can be edited so that it retains its narrative integrity and yet in no way refers to defendant, then use of it does not violate the principles of *Bruton.* The practical application of the theory may be difficult and in many cases it may be decided that separate trials are necessary. However, this kind of determination must be made on a case by case basis.

474 Pa. at 412, 378 A.2d at 860. We added that, as with most evidentiary questions, especially those involving balancing of competing interests, substantial deference must be afforded to the trial court's discretion. *Id.*

There have been subsequent refinements on the admission of a codefendant's confession in defendant's trial. Some courts have adopted the position that, where a codefendant's redacted confession nevertheless refers to the defendant by "contextual implication" or "evidentiary linkage," the redacted confession cannot be introduced in a joint trial. *See, e.g., Marsh v. Richardson,* 781 F.2d 1201 (6th Cir.1986), *rev'd* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Most courts, however, including this Court, have rejected the "contextual implication" theory as "a blanket rule. Such a rule would have the likely effect of making all statements by a codefendant inadmissible, regardless of whether they could properly be redacted." *Commonwealth v. Chestnut,* 511 Pa. 169, 174–75, 512 A.2d 603 (1986), approving *Commonwealth v. Rawls,* 276 Pa.Super. 89, 419 A.2d 109 (1980); *see, e.g., United States v. Belle,* 593 F.2d 487 (3rd Cir.1979) (en banc). There is the danger of prejudice where a codefendant's redacted confession which refers to the defendant by "contextual implica-

**4.** As we stated in *Johnson,* redaction in its broad sense indicates any revision or editing, but in its legal parlance has come to refer to the editing of a defendant's confession to eliminate references to a codefendant. 474 Pa. at 411, n. 1, 378 A.2d at 860, n. 1.

tion" is introduced in a joint trial, but this danger merely requires the trial court, and the reviewing court, to balance the interests, i.e., the potential prejudice to the defendant versus the probative value of the evidence, the possibility of minimizing the prejudice, and the benefits to the criminal justice system of conducting joint trials. *Commonwealth v. Chestnut, supra.*

Another refinement of the *Bruton* rule deals with so-called "interlocking confessions." Some courts have held that unredacted confessions of codefendants could nevertheless be introduced in a joint trial where the confessions were sufficiently "interlocking," i.e., where they corroborated each other in sufficient detail as to render the prejudice arising from the codefendant's confession naming the defendant as his accomplice minimal. *See, e.g., New York v. Cruz,* 66 N.Y.2d 61, 495 N.Y.S.2d 14, 485 N.E.2d 221 (1985), *rev'd* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). The United States Supreme Court rejected a *per se* rule of admissibility of interlocking confessions. In reversing the New York Court of Appeals, that Court held:

> [W]here a non-testifying codefendant's confession incriminating the defendant is not directly admissible against the defendant ..., the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him.

*Id.* at 193, 107 S.Ct. at 1719, 95 L.Ed.2d at 172. That Court reaffirmed the principle, though, that a defendant's "interlocking" confession "may be considered on appeal in assessing whether any Confrontation Clause violation was harmless...." *Id., citing Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). *See also Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) (while admission of codefendant's confession violated *Bruton* rule, its admission was at most harmless error in view of admission of petitioner's own confession which was minutely detailed, completely consistent with the objective evidence, internally consistent and not contradicted by other

evidence), *and Commonwealth v. Chestnut, supra* ("Under the circumstances ... the use of an unavailable witness's [a codefendant's] prior testimony against appellant's codefendant Floyd, which testimony a jury could reasonably infer implicated appellant despite redaction, was harmless error."). With these principles in mind, we review appellant's assertions that the admission of codefendant Eric Mason's confession in the joint trial prejudiced him.

■ Appellant claims that the court's pretrial denial of his motion to sever was error. He asserts that Eric Mason's redacted confession contextually implicated him. The appellant asserts "there is no doubt that the jury believed that the participant referred to in the codefendant's statements was the appellant. No redaction or cautionary instruction could convince the jury otherwise." We disagree. The appellant was not prejudiced by the introduction of his codefendant's confession in the joint trial, or by the court's refusal to sever.

■ The decision whether to sever trials of codefendants is one within the sound discretion of the trial court, and will not be disturbed on appeal absent a manifest abuse of that discretion. *Commonwealth v. Morales,* 508 Pa. 51, 61, 494 A.2d 367, 372 (1985). *See* Pa.R.Crim.P. Rules 1127A(2) and 1128. The critical factor that must be considered is whether the accused has been prejudiced by the trial court's decision. *Commonwealth v. Chestnut, supra* 511 Pa. at 175, 512 A.2d at 606. Thus, we must determine whether the introduction of codefendant Mason's redacted confession against appellant caused him any prejudice; we hold it did not.[5]

5. In *Richardson v. Marsh, supra,* 481 U.S. at 210, 107 S.Ct. at 1708–09, 95 L.Ed.2d at 187, the United States Supreme Court rejected a rule of automatic severance of codefendants' trials in these situations because of the "vital role in the criminal justice system" which joint trials play, stating:

It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes

█ Each confession was redacted by replacing the named accomplice with "the other guy." The jury was cautioned on numerous occasions that the confessions were to be considered as evidence only against the confessor. As there were two "other guys" who, the jury had heard, had participated in the reign of terror against the Harts (Larue Owens and Thomas Nixon), the use of "the other guy" in Eric Mason's statement did not necessarily refer to appellant. This "answer" would be too facile, however, and we do not rest our decision on it alone. Instead, we agree with appellant that, under the circumstances of this case, including the introduction of the largely corroborating confessions of the codefendants, Eric Mason's redacted confession did imply that his "other guy" accomplice was appellant. After all, appellant's redacted confession stated that he participated in the robbery-murder with an accomplice, and all of the evidence pointed to appellant as the principal actor in the vendetta against the Harts. The jury could infer that appellant was "the other guy" in codefendant Mason's account of the events of January 30, 1984. However, assuming that the admission of the codefendant's confession implicating appellant in the context of the other evidence violated the *Bruton* rule, any such error was harmless and did not prejudice appellant.

As the United States Supreme Court stated in *Schneble v. Florida, supra:*

> The mere finding of a violation of the Bruton rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it

trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

405 U.S. at 430, 92 S.Ct. at 1059. This is such a case. The evidence overwhelmingly implicated appellant as the perpetrator of the murder-robbery of Ferne and Bradley Hart. As the trial court stated in rejecting a related *Bruton* argument (to be discussed *infra*):

> In the present case, the evidence of the [appellant's] guilt which has already been recounted in some detail was overwhelming. The animosity of the [appellant] for the victims, the [appellant's] involvement in other crimes against the victims, the testimony of his accomplices in those other crimes, the [appellant's] possession of items stolen from the victims, both in earlier crimes and in the one culminating in their deaths, and the [appellant's] own confessions to all of these crimes were evidence of such overwhelming quality that [any violation of the *Bruton* rule] pales in comparison.

Slip op. at 14. Moreover, the court cautioned the jury "in the strongest possible terms that the statement, the alleged statement, of Eric Mason may only be considered as evidence against Eric Mason and no one else," and emphasized "most strongly that this statement ... can only be considered as evidence against the person who made this statement and no one else." Notes of Testimony (N.T.), Trial, June 26, 1985 at 61.

■ Under these circumstances, any *Bruton* violation was harmless, and appellant was not prejudiced by the court's refusal to sever his trial from his codefendant's trial.[6]

---

**6.** Appellant makes a separate argument that the refusal of the court to sever his trial prejudiced him because his allotment of peremptory challenges was thereby reduced from twenty to ten pursuant to Pa.R.Crim.P. Rule 1126(b). The Commonwealth had twenty peremptory challenges for both defendants. Appellant fails to inform us as to how he was prejudiced by the reduction in the number of peremptory challenges he would have received had he been tried alone, and we will not speculate as to possible prejudice. *Commonwealth v. Morales, supra* 508 Pa. at 63, 494 A.2d at 373. Furthermore, there is no

## TRIAL ERRORS

█ Appellant also argues that the court erred in refusing his motion for mistrial after Commonwealth witness, Detective Charles Brown, indicated on re-direct examination that "the two defendants implicated each other in their statements...." N.T., Trial, June 25, 1985 at 113. This remark was an unanticipated response to the prosecutor's question "Why wasn't [Larue Owens] a suspect in the homicides of Bradley and Ferne Hart?", a line of inquiry necessitated by suggestions of defense counsel on cross-examination that someone else might have committed these crimes and that, perhaps, the police investigation had not fully explored that possibility.

Defense counsel objected to Detective Brown's statement and the jury was immediately given a curative instruction to ignore that remark. The Commonwealth did not attempt to exploit this statement in any way.

The trial court held that Detective Brown's statement did violate appellant's rights under the Confrontation Clause and *Bruton*, but that clearly "the remark by Detective Brown, although improper, was harmless beyond a reasonable doubt." Slip op. at 14. For the reasons set forth in the preceding section, we agree with the trial court that Detective Brown's remark, although in violation of the *Bruton* rule, was harmless.

█ The Appellant next contends that the trial court erred in admitting into evidence testimony describing the physical condition of the Hart's daughter, Lisa, when she was discovered on February 2, 1984, and in admitting a photograph of Lisa Hart said to depict her physical condition at the time of the murders. Dr. Jeffrey Bado testified that he transported Lisa Hart to Einstein Northern Hospital for treatment on February 2, 1984, that she had a "ten second respiratory arrest" on the way, and that she was in a "preshock state" and suffering from hypothermia and

constitutional right to any peremptory challenges, let alone a specific number of them. *Id.* at n. 5.

severe dehydration. N.T. Trial, June 20, 1985 at 52–54. Dr. Samuel Hart was asked to identify a photograph of his granddaughter, Lisa, and testified that the photograph showed her approximate size and weight at the time of the murders. Appellant argues that this evidence had no relevancy to the offense for which he was being prosecuted and was offered only to prejudice the defendants by playing to the emotions of the jury and evoking sympathy for the victims and "for a child left an orphan."

The admissibility of evidence is, of course, a matter committed to the sound discretion of the trial court, and absent an abuse of discretion, the court's rulings on admissibility will not be overturned on appeal. *Commonwealth v. Coccioletti*, 493 Pa. 103, 111, 425 A.2d 387 (1981). The trial court must weigh the probative value of the evidence against its potential for prejudicing the defendant in making that determination. In this case, the trial court held that the evidence of Lisa Hart's physical condition was relevant to demonstrate malice, an essential element of murder of the first and third degrees, with which appellant and his accomplice acted, and that the evidence was also relevant to show the history of the events on trial and the "natural development of the facts." Slip op. at 9.

We agree with the trial court on both scores. "As has been often stated the distinguishing feature of murder is the presence of malice," *Commonwealth v. Culmer*, 463 Pa. 189, 192, 344 A.2d 487 (1975), which may be found from the circumstances attending a killing, and is demonstrated by a "wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty." *Commonwealth v. Hornberger*, 441 Pa. 57, 61, 270 A.2d 195, 197 (1970). Clearly, the evidence concerning Lisa Hart and her physical condition which resulted from appellant's and his codefendant's reckless and wanton disregard for her welfare was relevant to establish malice. It was also, as the court held, relevant as part of the chain or sequence of events that became part of the history of the events on trial and formed part of the

natural development of the facts. *Commonwealth v. Murphy*, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting *Commonwealth v. Williams*, 307 Pa. 134, 148, 160 A. 602, 607 (1932). Not surprisingly, and with good reason, criminal defendants always wish to excise evidence of unpleasant and unpalatable circumstances surrounding a criminal offense from the Commonwealth's presentation at trial. Of course, the court must assure itself that evidence of such circumstances has relevance to the case and is not offered solely to inflame the jury or arouse prejudice against the defendant. The court is not, however, required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which the defendant is charged. The court did not err, therefore, in admitting the evidence of Lisa Hart's physical condition.

 Appellant next asserts the trial court erred in permitting the jury to view photographs of the bodies of the murder victims. In *Commonwealth v. Buehl*, 510 Pa. 363, 391–392, 508 A.2d 1167, 1181–82 (1986), we stated:

The question of admissibility of photographs of a corpse in homicide cases is a matter within the discretion of the trial judge and only an abuse of that discretion will constitute reversible error. *Commonwealth v. Hudson*, 489 Pa. 620, 414 A.2d 1381 (1980); *Commonwealth v. Batty*, 482 Pa. 173, 393 A.2d 435 (1978). A photograph of a bloody corpse in a homicide trial is not inflammatory *per se. Hudson, supra,* 489 Pa. at 631, 414 A.2d at 1387. Whether the photographs are admissible depend on a two step analysis. First, the court must decide whether a photograph is inflammatory in nature. "If, but only if, the photograph is deemed to be inflammatory, the Court must then apply the balancing test ... i.e., is the photograph of 'such essential evidentiary value that [its] need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.'" [Citations omitted.] *Commonwealth v. Miller*, 490 Pa. 457, 417 A.2d 128 (1980).

The black and white photographs of the victims shown to the jury in the instant case [7] were certainly not pleasant, as they showed the bodies from various angles and depicted the manner in which their hands and feet had been bound, their faces covered with tape, the ligations around their throats and the water in which their heads had been submerged. The jury saw each photograph only briefly (55–70 seconds each to circulate among all the jurors) after first being instructed by the court to "view them quickly, observe what you see, move on and fight the impulse to be controlled by your emotion." N.T. Trial, June 20, 1985 at 74–87. The court stated that: "These photographs were extremely relevant in establishing the intent and malice with which the defendant acted and this far outweighed any inflammatory or prejudicial effects which might have attended their admission." Slip op. at 10. We agree. The court did not err in admitting these photographs.

The photographs were of essential evidentiary value in establishing the manner of death, malice, the premeditation and planning and the specific intent to kill, and the court did not abuse its discretion in holding that their probative value outweighed any prejudicial effects. *See Commonwealth v. Buehl, supra.*

Appellant's next claim is that the court erred in admitting asserted hearsay through the testimony of Officer Debra Murphy. Officer Murphy testified about certain statements made by Bradley and Ferne Hart on August 14, 1983, when Officer Murphy went to the Hart residence to investigate the initial burglary. The most "objectionable" of these statements were Mr. Hart's statement that "his house had been broken into," and Mrs. Hart's statement that "her rings had been taken." N.T. Trial, June 13, 1985 at 81, 84–85. Appellant attempts to demonstrate that these statements were inadmissible under the "res gestae," or more specifically, the "excited utterance" exceptions to the

7. Commonwealth exhibits C45–C48 depicted the body of Ferne Hart from various perspectives, and exhibits C49–C51 depicted the body of Bradley Hart.

hearsay rule. However, he does not indicate how he might have been prejudiced by these statements, and indeed, in view of the overwhelming evidence that this burglary in fact occurred and that appellant confessed to committing the burglary along with Larue Owens, he could not have been prejudiced in any way by these statements of Ferne and Bradley Hart.

■ Appellant's final allegation of trial error is that the court should not have permitted Detective Charles Brown to testify regarding a telephone conversation between Dr. Samuel Hart and another detective that Detective Brown had monitored on an extension. The essence of this telephone conversation was that Dr. Hart indicated that Bradley Hart had become dissatisfied with appellant's work, that appellant was fired and owed money as a result of this dissatisfaction, and that appellant was resentful and threatened to kill Bradley Hart. N.T. Trial, June 25, 1985 at 123–24. The court cautioned the jury, before and after Detective Brown's testimony, that it was not being offered for the truth of the contents of the conversation, but only "to show that a certain communication or statement was made to the Police Department." N.T. *Id.* at 123, 124–25.

We agree with the court that this conversation was not hearsay as it was not offered to prove the truth of the matters contained therein. *Commonwealth v. Sampson,* 454 Pa. 215, 311 A.2d 624 (1973). Rather, the conversation between the detective and Dr. Hart was in response to defense counsel's questioning, on cross-examination, about other possible enemies of the Harts and suspects that might have been overlooked by the police and, specifically, to the question: "Prior to the arrest of my client [appellant], did any of the Harts ever mention Robert Wharton?" As the trial court stated, defense counsel "opened the door" to questions concerning the Hart family's communications to the police, and Detective Brown's testimony regarding the conversation between Dr. Hart and the other detective was not offered for the truth of the assertions therein, but only to show that the communication in fact took place and that

Dr. Hart had "mentioned Robert Wharton" to the police. The conversation was, thus, admissible.

## SENTENCING ERRORS

Appellant's remaining arguments concern the sentencing proceedings and his judgments of sentence of death. Our standard of review of a sentence of death is established by the recently amended Section 9711(h) of the Sentencing Code which provides in relevant part: [8]

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings as provided in paragraph (4).

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

(4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a

8. Section 3 of Act 1988–179, provides in part that Section 2 (amending subsection (h) of this section) shall apply to all criminal offenses committed on or after the effective date of this act and to all criminal cases and appeals pending on the effective date of this act. *See* Historical Note, 42 Pa.C.S.A. § 9711. Because the appeal in this case was pending when the Act became effective on December 21, 1988, the amended Section 9711(h) of the Sentencing Code is applicable.

new sentencing hearing pursuant to subsections (a) through (g).

42 Pa.C.S. § 9711(h), As amended 1988, Dec. 21, P.L. 1862, No. 179 § 2, imd. effective.

As previously noted, the Commonwealth introduced no additional evidence at the sentencing phase, and argued that the incorporated trial evidence supported four aggravating circumstances as to each murder for each defendant. The jury found in appellant's case three of those aggravating circumstances for each murder victim, namely; that appellant had "committed a killing while in the perpetration of a felony," that he had "knowingly created a grave risk of death to another person in addition to the victim," and that the "offense was committed by means of torture." 42 Pa.C.S. § 9711(d)(6), (7) and (8), respectively. The jury also found that these aggravating circumstances outweighed the three mitigating circumstances it found, namely that appellant had no significant history of prior criminal convictions, his age at the time of the crime (twenty), and the other evidence (from character witnesses) concerning his character and record. 42 Pa.C.S. § 9711(e)(1), (4) and (8). Accordingly, the jury returned two sentences of death, which appellant would now have us vacate.

 Appellant argues that the court improperly denied him his right to allocution at the time of sentencing by its ruling that a defendant who took the stand to testify and/or to express remorse at the sentencing proceeding would be subject to cross-examination. We rejected a similar argument in *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846 (1989).

 Appellant also argues it was error for the court to permit the Commonwealth to incorporate the trial evidence at the sentencing phase "instead of introducing independent evidence. Since the Commonwealth presented no evidence in support of the aggravating circumstances, the death penalty was improperly imposed." Brief for Appellant at 35–36. "This argument is frivolous. Appellant's guilt had

already been determined, and the incorporation of this evidence into the penalty stage was purely a procedural matter carried out pursuant to 42 Pa.C.S. § 9711." *Commonwealth v. Albrecht*, 510 Pa. 603, 511 A.2d 764, 777 (1986).

■■■ Appellant next challenges the constitutionality of the aggravating circumstances found in this case on overbreadth or vagueness grounds. He asserts that subsection (d)(6), the "defendant committed a killing while in the perpetration of a felony," is unconstitutional as it "permits the imposition of the death sentence for second degree murder." This argument is absurd—the separate sentencing phase under section 9711 commences only "after a verdict of murder of the first degree is recorded. . . ." 42 Pa.C.S. § 9711(a)(1). Appellant was convicted of two counts of murder of the first degree, and the evidence showed that these homicides were not the product of some hastily-formed intent to kill, but were fully thought-out and planned, and methodically and coldly executed.

■■■ Appellant also asserts that subsection (d)(7) is unconstitutionally vague, since this provision fails to define "grave risk of death to another person." This Court has not addressed this specific vagueness challenge to subsection (d)(7), "grave risk of death." The United States Supreme Court has, however, upheld similar statutes establishing an aggravating circumstance for knowingly creating a "great risk" of death against vagueness and over-breadth challenges. *Gregg v. Georgia*, 428 U.S. 153, 203–04, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 256, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976).

This Court has previously addressed and rejected vagueness challenges to various other aggravating circumstances. *See Commonwealth v. Fahy*, 512 Pa. 298, 315–16, 516 A.2d 689, 698 (1986). The jury is quite capable of understanding the meaning of "grave risk" and of applying its common sense and experience to the facts to determine whether a grave risk had indeed been created. It did so here. Accordingly, we reject appellant's vagueness chal-

lenge. *See Commonwealth v. Smith,* 518 Pa. 15, 540 A.2d 246 (1988).

 Appellant also argues that Section 9711(d)(8) is unconstitutionally vague in failing to define the term means of torture. This subsection simply provides [t]he offense was committed by means of torture. In *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985), we rejected the argument that subsection (d)(8) is unconstitutionally vague in its failure to define the phrase means of torture.

In *Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728 (1987), we held that while subsection (d)(8) is not unconstitutionally vague, the trial court's minimal instruction on this aggravating circumstance tracking the language of the statute was prejudicially deficient. We further concluded that trial counsel was ineffective in his assistance when he failed to make a timely objection to that charge. *Id.,* 514 Pa. at 280, 523 A.2d at 738.

In *Commonwealth v. Crawley,* 514 Pa. 539, 526 A.2d 334 (1987), we found that the Commonwealth must prove that a defendant had a specific intent to inflict unnecessary pain, or suffering or both pain and suffering in addition to the specific intent to kill to establish that the offense was committed by means of torture. *Id.,* 514 Pa. at 564, 526 A.2d at 347. *See also Commonwealth v. Caldwell,* 516 Pa. 441, 532 A.2d 813 (1987).

In the case *sub judice,* the trial court instructed the jury in language tracking the Sentencing Code, that a possible aggravating circumstance was that "the offense was committed by means of torture". N.T. Sentencing Hearing, July 5, 1985 at 61. Defense counsel did not object to this charge, nor did he request a more specific instruction. As in *Nelson,* the absence of any such instruction on torture was prejudicially deficient. For this reason we need not address appellant's claim as to whether there is sufficient evidence to sustain a finding of the aggravating circumstance that the offenses were committed by means of torture, 42 Pa.C.S. § 9711(d)(8).

■ The Appellant next contends that the evidence does not support a finding that the killings were committed in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6) and that in the commission of the offenses he knowingly created a grave risk of death to another person in addition to the victims of the offenses; 42 Pa.C.S. § 9711(d)(7). Specifically, appellant argues, with respect to subsection (d)(7), that the evidence of grave risk of death to others was insufficient because the condition of the victims' daughter was not directly related to the violence inflicted upon the victims and the risk of death must be an immediate part of the murderous act itself. These claims are meritless.

We have examined the record of trial and sentencing proceedings and we hold that the evidence supports the aggravating circumstances of subsections (d)(6) and (d)(7) that were found by the jury beyond a reasonable doubt. The facts of the case amply demonstrate that both killings were committed while in the perpetration of a felony, namely a knife-point robbery. 18 Pa.C.S. § 3701. Equally clear from the record is the fact that in the commission of these murders, appellant, who had taken the victims' seven month old infant to the second floor, knowingly created a grave risk of death by abandoning the infant in the house, turning off the heat in the dead of winter, causing the temperature in the house to plunge to fifty degrees.

Because the jury found three mitigating circumstances and two of the three aggravating circumstances have been sustained, we must determine the appropriate remedy. The Sentencing Code in relevant part provides:

(4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. *If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand*

*for a new sentencing hearing pursuant to subsections (a) through (g).*
42 Pa.C.S. § 9711(h)(4) (emphasis added).

Accordingly, while we sustain appellant's convictions, we vacate the sentences of death and remand the case to the Court of Common Pleas of Philadelphia County for a new sentencing hearing in accordance with the provisions of 42 Pa.C.S. §§ 9711(a)–(g). Appellant's petition for reconsideration of our denial of his motion to consolidate appeals is denied.

Jurisdiction relinquished.

LARSEN, J., files a dissenting opinion in which McDERMOTT, J., and PAPADAKOS, J., join.

LARSEN, Justice, dissenting.

I dissent to the portion of the majority opinion vacating appellant's judgments of sentence.

The Sentencing Code, in § 9711(h)(4), provides as follows:
(4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. *If the Supreme Court determines that the death penalty must be vacated for any other reason,* it shall remand for a new sentencing hearing pursuant to subsections (a) through (g). 42 Pa.C.S.A. § 9711(h)(4) (emphasis added).

The majority concludes that when a death sentence is based in part on an invalid or improperly defined aggravating circumstance, the appropriate remedy is to vacate the sentence of death and remand the case for a new sentencing hearing. Since this conclusion is not mandated by the Sentencing Code, which uses the conditional language, *"If* the Supreme Court determines that the death penalty must be vacated ..." (emphasis added), the decision to vacate and remand under such circumstances should be reexamined.

Such reexamination is particularly appropriate in light of *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), in which the United States Supreme Court held that a state appellate court may reweigh the remaining aggravating and mitigating circumstances when an aggravating circumstance relied on by the jury has been invalidated.

The rationale underlying *Clemons* is that appellate reweighing accords with the primary concerns of the Eighth Amendment: measured, consistent application of the death penalty and fairness to the defendant. Sentencing determinations, in order to meet these objectives, must be based on the circumstances of the crime and the character of the defendant. *Id.* 110 S.Ct. at 1448. The *Clemons* Court concluded that state appellate courts, in reviewing death sentences, can and do give each defendant an individualized and reliable sentencing determination. In reaching this conclusion, the *Clemons* Court noted the fact that a process of weighing aggravating and mitigating circumstances is involved in an appellate court's proportionality review. I believe that there is little value in assembling another jury for a sentencing proceeding when it is constitutionally permissible and eminently reasonable for this Court to undertake a careful weighing of remaining aggravating and mitigating circumstances. The ability to weigh aggravating and mitigating factors is not a characteristic unique to juries. The United States Supreme Court, in *Barclay v. Florida*, 463 U.S. 939, 950, 103 S.Ct. 3418, 3425, 77 L.Ed.2d 1134 (1983), reiterated the essential elements of sentencing decisions in capital cases as follows:

> Any sentencing decision calls for the exercise of judgment ... The thrust of our decisions on capital punishment has been that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action (citations omitted).

The critical concern, then, is that capital sentencing decisions be legitimate, not that they be made by juries. To remand this case for a new sentencing hearing does nothing to enhance the legitimacy of the sentence.

The majority opinion states that the record supports the following aggravating circumstances found by the jury: appellant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6) and in commission of the offenses, appellant knowingly created a grave risk of death to others. 42 Pa.C.S. § 9711(d)(7). It is entirely proper and preferable for this Court to weigh these aggravating circumstances against the following mitigating circumstances found by the jury: no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); age of the defendant (twenty years old) at the time of the offenses; and other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense. 42 Pa.C.S. § 9711(e)(8). This evidence included testimony from appellant's mother that he was a loving son and testimony from members of the community that appellant was a gentleman and a high school wrestler with leadership abilities.

I believe that in the reweighing process, this Court would find that the remaining aggravating circumstances continue to outweigh the mitigating circumstances. With or without the consideration of torture, it is evident that the robbery and brutal murders of these two individuals and the life-threatening treatment of their infant daughter outweigh the fact that appellant was twenty years old at the time of these offenses, had no significant history of criminal convictions and was a gentleman and a loving son. As the majority opinion points out, "Appellant was convicted of two counts of murder of the first degree, and the evidence showed that these homicides were not the product of some hastily formed intent to kill, but were fully thought out and planned, and methodically and coldly executed." (Majority Opinion at 152).

Accordingly, I would affirm the convictions of murder of the first degree and affirm the judgments of sentence.

McDERMOTT, J., and PAPADAKOS, J., join this dissenting opinion.